**VICTORIA'S SECRET STORES,
et al., Plaintiffs,**

v.

**ARTCO EQUIPMENT COMPANY,
INC., et al., Defendants.**

No. C–2–01–198.

United States District Court,
S.D. Ohio,
Eastern Division.

March 27, 2002.

John L Landolfi, Vorys Sater Seymour & Pease—2, Columbus, OH, Melise R Blakeslee, Robert W Zelnick, Carrie A Shufflebarger, Lisa Dunner, McDermott Will & Emery—2, Washington, DC, for Victoria's Secret Stores, Inc., V Secret Catalogue Inc, Victoria's Secret Direct LLC, Intimate Beauty Corporation dba Victoria's Secret Beauty, plaintiffs.

Laurence Edward Sturtz, Carlile Patchen & Murphy—2, Columbus, OH, for Artco Equipment Company Inc, Holt Industries LLC, Howard Goldberg, defendants.

Howard Goldberg, Westwood, NJ, pro se.

### *OPINION AND ORDER*

GEORGE C. SMITH, District Judge.

Plaintiffs Victoria's Secret Stores, Inc., V Secret Catalogue, Inc., Victoria's Secret Direct, LLC, and Intimate Beauty Corp. (collectively "Victoria's Secret") bring this action under The Lanham Act, 15 U.S.C. § 1051, et seq., against defendants Artco Equipment Company, Inc. ("Artco"), Holt Industries, LLC ("Holt"), and Howard Goldberg ("Defendant Goldberg").

Plaintiffs assert trademark infringement, unfair competition, false designation of origin, trademark dilution, cybersquatting, and other related state law claims

against defendants for defendants' unauthorized use of plaintiffs' VICTORIA'S SECRET mark in their domain name, website text, hyperlinks, and metatags.

This matter is before the Court to review defendants' objections to the magistrate judge's Report and Recommendation (doc. 29) ("R & R"). The R & R considers defendants' August 29, 2001 motion to set aside the Clerk of Court's May 10, 2001 entry of default (doc. 23) and plaintiffs' June 13, 2001 motion for default judgment (doc. 10). The magistrate judge recommended the Court deny defendants' motion to set aside the entry of default and grant plaintiffs' motion for default judgment.

For the following reasons, the Court overrules defendants' objections, adopts the R & R except for the modifications noted below, denies defendants' motion to set aside the entry of default, and grants plaintiffs' motion for default judgment. Further, the Court denies defendants' August 29, 2001 motion to strike notice (doc. 21) and September 7, 2001 motion to vacate the preliminary injunction (doc. 26) as moot.

## I. Facts

Plaintiff V Secret Catalogue, Inc., is the record owner of the VICTORIA'S SECRET trademark, which has been registered in the United States Patent and Trademark Office since January 20, 1981. (Compl.Ex. 5.) V Secret Catalogue, Inc. licenses Victoria's Secret Stores, Inc., Victoria's Secret Catalogue, LLC, and Intimate Beauty Corp. to use the Victoria's Secret trademark. Victoria's Secret sells women's lingerie, clothing, beauty products, and accessories. Victoria's Secret operates the website "www.victoriasse-

cret.com" from which it promotes and sells its products. (Compl.¶¶ 6, 31–34.)

As alleged in the complaint and not disputed by defendants, defendant Howard Goldberg is president of defendant Artco and an officer of defendant Holt. Goldberg is a resident of New Jersey and his companies have their principal places of business in New Jersey. (Compl.¶¶ 10–12.) Defendants operate the following websites from which they promote and sell women's lingerie, adult sex toys, and other adult-oriented merchandise: www.houseoflovetoys.com, www.bodyshack.com, and www.heartsarewild.com. (Compl.¶¶ 13–14.)

In their complaint, plaintiffs seek damages for defendants' unauthorized use of variations of the VICTORIA'S SECRET mark in their Internet domain name, website text, hyperlinks, and metatags. Specifically, plaintiffs assert claims for trademark infringement, trademark dilution, unfair competition, cybersquatting, false advertising, and violations of Ohio's statutory and common law. (Compl.¶¶ 1–5.)

Plaintiffs allege the following facts to support their claims. First, plaintiffs contend defendants registered a domain name containing the VICTORIA'S SECRET mark on June 30, 1999. (Compl.¶ 39, Ex. 7.) Specifically, they claim defendants registered the domain name www.victoriassecrets.net in an attempt to divert consumers to defendants' own websites for commercial gain. (Compl.¶ 39.) The parties arbitrated this claim pursuant to the Internet Corporation for Assigned Names and Numbers ("ICANN") Uniform Domain Name Dispute Resolution Policy.[1] The arbitration panel transferred ownership of the victo-

---

1. ICANN is a non-profit, private-sector corporation formed by a coalition of the Internet's business, technical, academic, and user communities. ICANN coordinates the technical management of the Internet's domain name system, allocates Internet provider address space, assigns protocol parameters, and manages the root server system. *See* ICANN Fact Sheet, *available at http://www.icann.org* (last visited March 25, 2002).

riassecrets.net domain name to plaintiffs. (Compl.Ex. 8.) Plaintiffs now seek damages for defendants' use of the VICTORIA'S SECRET mark in their domain name, claiming trademark infringement, 15 U.S.C. § 1114, trademark dilution, 15 U.S.C. § 1125(c), and violations of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

Second, plaintiffs contend defendants used the VICTORIA'S SECRET mark as hyperlinks in the text of two of their websites to divert Internet traffic to defendants' other commercial websites. (Compl.¶¶ 45–53.) They allege this conduct constitutes trademark infringement and trademark dilution.

The First Accused Website[2]—as plaintiffs call it—features the phrase "Victorias Secret or victoria's secret" above the image of a scantily-clad lingerie model relaxing on top of a piano. (Compl.Ex. 10.) The webpage designer superimposed the Internet address "www.heartsarewild.com" across the legs of the piano bench. (*Id.*) The webpage contains the following text and hyperlinks[3] beneath the image:

> Enter
>
> If you are looking for any of the following valentines day gifts:
> - *victorias secrets*
> - *victoria's secrets gifts*
> - *victorias secrets catalogs*
> - *victorias secrets models*
>
> Look no further. FREE SHIPPING! NO SALES TAX! You'll find it at *victorias secrets!*

(Compl.Ex. 10.) Rather than linking to plaintiffs' victoriassecret.com website, however, plaintiffs allege the hyperlinks transported Internet users to defendants' bodyshack.com website, which contains links to defendants' houseoflovetoys.com and heartsarewild.com websites. (Compl.¶ 47–48, Ex. 2.)

Plaintiffs allege the Second Accused Website[4] contains similar language. The top of the website features "Victorias Secret" in a large, bold font. (Compl.Ex. 12.) It also contains the following text:

> If you are looking for any of the following topics:
> - *victorias secret*
> - *victoria's secret fashion show*
> - *victorias secret lingerie*
> - *victoria secret*
>
> Look no further. You'll find it at *Hearts Are Wild!*
>
> Interested in Victoria's Secret? We offer free shipping and you pay no sales tax! For the best women's lingerie, you've come to the right place.
>
> At Hearts Are Wild, you'll discover an easy to use, information packed web site. *www.heartsarewild.com.*

(Compl.Ex. 12.) When an individual accesses this site, plaintiffs allege a new browser opens to defendants' heartsarewild.com, which sells defendants' lingerie products. (Compl.¶ 51, Ex. 13.)

Finally, plaintiffs allege defendants placed variations of the VICTORIA'S SECRET mark as metatags in the source code of defendants' "accused" websites, so that an Internet search for "Victoria's Secret" would feature defendants' websites as a high-ranking result. (Compl.¶¶ 49–50.) They contend the use of the VICTORIA'S SECRET mark in metatags constitutes trademark infringement and trademark dilution. As evidence of this claim, *inter alia*, plaintiffs state a February 16, 2001

---

**2.** http://secure100.local.net/~htoy/victorias-secret.html.

**3.** Similar to the original website, the Court has underlined the hyperlinks.

**4.** http://www.secure100.local.net/~htoy/victoria.html

Internet search on Lycos.com for "victorias secret" produced defendants' secure100.local.net/~htoy/victoria.html website as its second-ranked result. (Compl.¶ 44, Ex. 9.)

Plaintiffs filed this lawsuit on March 2, 2001. Plaintiffs served Defendant Goldberg on March 9, 2001 in his personal capacity. (Summons (doc.5).) According to plaintiffs, Defendant Goldberg refused to accept service on behalf of the two corporate defendants. He allegedly told the process server that one of the corporate defendants had moved and he had never heard of the other. (Farrington Aff. ¶¶ 5–6.) On March 16, 2001, the process server returned with filings from the New Jersey Secretary of State's office showing Defendant Goldberg as a registered agent for the two corporate defendants. At that point, Defendant Goldberg accepted service. (Summons (doc. 6), Farrington Aff. ¶¶ 6–7.)

In the weeks following service, defendants did not file an answer or other responsive pleading. Therefore, plaintiffs requested an entry of default (doc. 7) on May 10, 2001. Later that day, the Clerk of Court made an entry of default (doc. 8) against defendants for failure to plead or otherwise appear. On June 13, 2001, plaintiffs filed a motion for default judgment (doc. 10).

The Court never heard from defendants until June 26, 2001. In a letter dated June 22, 2001 (doc. 11), Defendant Goldberg expressed his "wish to defend and plead" and stated that he was "currently seeking counsel." He also stated he telephoned Victoria's Secret "to discuss a possible settlement, but it seems that it is not an option." According to Defendant Goldberg, he had met with several lawyers, but was having difficulty finding counsel. Therefore, he requested additional time to retain counsel. (Goldberg June 26, 2001 Letter to Court.)

At that point, this Court referred plaintiffs' motion for default judgment to the magistrate judge for a hearing and report and recommendation. (July 12, 2001 Order (doc. 13).) The magistrate judge held a hearing on August 15, 2001, during which plaintiffs and defendants argued whether the Court should grant default judgment or vacate the entry of default. (Tr. of August 15, 2001 Hearing (doc. 17).) On October 2, 2001, the magistrate judge filed his R & R, which recommended that the Court deny defendants' motion to set aside the default and grant plaintiffs' motion for default judgment. Defendants filed objections to the R & R (doc. 30) and plaintiffs responded (doc. 31).

## II. Standard of Review

In determining the appropriate standard of review, the Court must decide whether a motion for default judgment is nondispositive or dispositive. A nondispositive motion is governed by 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a). Dispositive motions come within 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). The list of dispositive motions contained in § 636(b)(1)(A) is nonexhaustive and unlisted motions that are functionally equivalent to those listed in § 636(b)(1)(A) also are considered dispositive. *Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 515 (6th Cir.2001). Thus, a court must analyze the motion's potential effect on litigation to determine whether a particular motion is dispositive. *Id.* at 514–15.

Although not specifically listed in 28 U.S.C. § 636(b)(1)(A), a motion for a default judgment has been found dispositive because it is "substantially similar to several of the listed motions." *Callier v. Gray*, 167 F.3d 977, 981 (6th Cir.1999). Therefore, the Court must review *de novo* the objections filed to the magistrate judge's R & R. 28 U.S.C. § 636(b)(1); Fed.

R.Civ.P. 72(b); *United States Fidelity and Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1088 (6th Cir.1992); *Thornton v. Jennings*, 819 F.2d 153, 154 (6th Cir.1987). *De novo* review is constitutionally and jurisdictionally mandated under Article III of the U.S. Constitution. *See Flournoy v. Marshall*, 842 F.2d 875, 878–79 (6th Cir. 1988).

■ If a motion is dispositive, a magistrate judge may issue only proposed findings and recommended dispositions in response to that motion. *See* 28 U.S.C. § 636(b)(1)(B). Only an Article III judge can issue a dispositive order. *Id.* After being served with a copy of a magistrate judge's recommended disposition, a party has ten days within which to file objections with the district court. *See* 28 U.S.C. § 636(b)(1)(C). A district court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.; see also U.S. v. Raddatz*, 447 U.S. 667, 673–74, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir. 1988); *U.S. v. Shami*, 754 F.2d 670, 672 (6th Cir.1985); *E.E.O.C. v. Keco Indus., Inc.*, 748 F.2d 1097, 1102 (6th Cir.1984); *Hill v. Duriron Co.*, 656 F.2d 1208, 1214 (6th Cir.1981). Failure to make a *de novo* determination constitutes reversible error. *Keco Indus.*, 748 F.2d at 1102. In conducting a *de novo* review, the judge is free to accept, reject, or modify any of the magistrate's findings and recommendations. 28 U.S.C. § 636(b)(1); *Raddatz*, 447 U.S. at 673–74, 680, 100 S.Ct. 2406.

The *de novo* standard of review contrasts with the "clearly erroneous" standard applicable to nondispositive, pretrial matters. The U.S. Supreme Court distinguishes these statutory provisions as follows:

In § 636(b)(1)(A), Congress provided that a district court judge could des-

ignate a magistrate to "hear and determine" any pretrial matter pending before the court, except certain "dispositive" motions. Review by the district court of the magistrate's determination of these nondispositive motions is on a "clearly erroneous or contrary to law" standard.

Certain "dispositive" motions ... are covered by § 636(b)(1)(B). As to these "dispositive" motions, the district judge may "designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court of [the] motions." However, the magistrate has no authority to make a final and binding disposition. Within 10 days after the magistrate files his proposed findings and recommendations, any party may file objections. The statute then provides:

"A judge of the court shall make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." § 636(b)(1) (emphasis added).

*Raddatz*, 447 U.S. at 673–74, 100 S.Ct. 2406.

■ The requirement of *de novo* review does not, however, mandate a *de novo* hearing on the evidence. As noted in *Raddatz:*

It should be clear that on these dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing. We find nothing in the legislative history of the statute to support the

contention that the judge is required to rehear the contested testimony in order to carry out the statutory command to make the required "determination." *Raddatz*, 447 U.S. at 674, 100 S.Ct. 2406. The holding of a *de novo* hearing is solely at the discretion of the judge. *Id.* at 675–76, 100 S.Ct. 2406 (citing H.R.Rep. No. 94–1609 (1976)); *Duriron*, 656 F.2d at 1214 (citing H.R.Rep. No. 94–1609). As such, the statute permits "whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *Raddatz*, 447 U.S. at 676, 100 S.Ct. 2406.

■ Therefore, a de novo determination requires "fresh consideration [of] those issues to which specific objection has been made by a party." *Id.* at 675, 100 S.Ct. 2406 (citing H.R.Rep. No. 94–1609). The Court will consider the record developed by the magistrate judge before making its own determination on the basis of that record.

### III. Discussion

Defendants object to several portions of the magistrate judge's R & R. In general, they contend the magistrate judge ignored the principle that judicial policy favors trial on the merits. Defendants also argue the magistrate judge misapplied applicable Sixth Circuit precedent in assessing defendants' motion to set aside default. They specifically challenge his findings concerning prejudice, meritorious defenses, and culpability.

### A. Policy Favoring Trial on the Merits

Defendants' first objection concerns the standards and policy considerations underlying this case. Defendants argue the magistrate judge ignored the judicial policy in favor of trial on the merits as compared to a default judgment. They also suggest the magistrate judge should apply the more liberal standard of Federal Rule of Civil Procedure 55(c) to their claim because the Court has not entered a default judgment in the present action. Thus, defendants claim they should prevail because good cause exists to set aside the default. Using these standards, defendants are "flabbergasted that the Magistrate has recommended that the Court should enter a judgment of default in the instant action." (Defs.' Objections at 1.)

■ The Court initially questions whether this objection satisfies the standard under 28 U.S.C. § 634. Under this section, a district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 634(b)(1)(C). Objections must be sufficiently specific to put the district court on notice of the urged error. *Williams v. K & B Equip. Co.*, 724 F.2d 508, 511 (5th Cir.1984). The Court finds defendants' objection that given the applicable standards "they are flabbergasted that the Magistrate has recommended that the Court should enter a judgment of default in the instant action" fails to meet the specificity required by the statute.

Even if defendants' objection is sufficiently specific to warrant *de novo* determination, the Court finds no indication that the magistrate judge improperly applied any standard or policy. The magistrate judge's work demonstrates his understanding of the proper standards. He began the August 15, 2001 hearing by articulating the proper Sixth Circuit standard for determining whether good cause exists as required by Federal Rule of Civil Procedure 55(c) to vacate a default under *United Coin Meter v. Seaboard Coastline R.R.*, 705 F.2d 839 (6th Cir.1983), and noting that "trials on the merits are favored." (Tr. of August 15, 2001 Hearing at 2–3.) He also thoroughly cites *United Coin Me-*

*ter* and other cases in which courts have applied its test. (*See, e.g.*, R & R at 7–8, 32.)

In essence, defendants suggest that, given the Sixth Circuit standard and judicial policy favoring trials on the merits, the magistrate judge could not have recommended a default judgment in this case. The Court addresses defendants' concerns with the application of the Sixth Circuit *United Coin Meter* test below. In response to defendants' claim that the magistrate judge ignored the judicial policy favoring trials on the merits, this Court finds the policy does not require the magistrate judge to recommend one disposition or another. Further, this policy does not mandate that the Court conduct a trial on the merits when a party shows little initiative in litigating the claims.[5] If it did, there would be no reason for the Sixth Circuit's *United Coin Meter* test. In summary, neither the Sixth Circuit standard on its face nor the judicial policy favoring trials on the merits suggests this Court should reach a different conclusion than the magistrate judge's recommendation. Therefore, the Court overrules defendants' first objection.

### B. *United Coin Meter Test*

Federal Rule of Civil Procedure 55(c) allows a court to vacate an entry of default . "for good cause shown." Fed. R.Civ.P. 55(c). The question of what constitutes "good cause" is left to the trial court's discretion. *Shepard Claims Serv., Inc. v. William Darrah & Assocs.*, 796 F.2d 190, 193 (6th Cir.1986). A strong preference for trial on the merits, however, limits this discretion. *Id.* Further,

courts should grant motions to set aside default entries more liberally than those seeking to vacate default judgments. *Mfrs.' Indus. Relations Ass'n v. East Akron Casting Co.*, 58 F.3d 204, 208 (6th Cir.1995). As a result, the Sixth Circuit requires less than a "glaring abuse" of discretion to reverse a court's refusal to set aside an entry of default. *Smith v. Comm'r*, 926 F.2d 1470, 1481 (6th Cir. 1991).

The Sixth Circuit requires district courts to weigh three factors in determining whether to grant a motion to vacate an entry of default. *United Coin Meter*, 705 F.2d at 845. A court must determine whether (1) the plaintiff will be prejudiced by vacating an entry of default; (2) the defendant has any meritorious defenses; and, (3) culpable conduct of the defendant led to the default. *Id.* These factors must be balanced. *United Coin Meter*, 705 F.2d at 846; *Waifersong v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir.1992). Where a plaintiff would not be prejudiced by reopening the case and defendant has a meritorious defense, it is an abuse of discretion for a district court to deny a Rule 55(c) motion in the absence of a willful failure of the moving party to appear and plead. *Shepard Claims Serv.*, 796 F.2d at 194.

Finally, the court should construe all ambiguous or disputed facts in the light most favorable to the defendant in determining whether to set aside the entry of default. *INVST Fin. Group, Inc. v. Chem–Nuclear Sys., Inc.*, 815 F.2d 391, 398 (6th Cir.1987).

---

**5.** The Court reminds defendants of the purposes of default. A court's ability to use default "not only provides the trial court with a significant tool for enforcing compliance with the rules of procedure, thereby encouraging an orderly and efficient judicial system, but it also serves to protect diligent parties who have acted expeditiously and in accordance with the rules of the court." *Chandler Leasing Corp. v. UCC, Inc.*, 91 F.R.D. 81, 83 (N.D.Ill.1981).

### 1. Prejudice to Plaintiffs

■ Although the magistrate judge found plaintiffs' arguments regarding prejudice "largely unpersuasive," he concluded plaintiffs would suffer some prejudice as "further delay in this matter will increase the likelihood Goldberg will be able to frustrate recovery of any final judgment." (R & R at 13–14.)

Defendants object to the magistrate judge's finding that vacating the default entry will prejudice plaintiffs. They argue the use of defendants' past failures to satisfy other judgments violates the Federal Rules of Evidence as impermissible character evidence. Defendants also suggest Defendant Goldberg's statements regarding his intentions to file for bankruptcy constitute hearsay and cannot be considered by the Court.

■ The Court overrules defendants' objections. First, Defendant Goldberg's alleged failures to pay previous judgments does not constitute character evidence. Character evidence is inadmissible to prove an action in conformity with the alleged character trait. F.R. Evid. 404(a). Evidence of other acts may be admissible, however, to show a plan. F.R. Evid. 404(b). The Court finds the evidence presented regarding Defendant Goldberg's failure to pay past judgments falls within this exception. The Federal Rules of Evidence allow evidence of a defendant's other crimes, wrongs, or acts to show a common plan where the probative value of that evidence outweighs its potential prejudicial effect. *United States v. Ellzey*, 874 F.2d 324, 329 (6th Cir.1989). The evidence presented regarding previous judgments that remain unpaid shows Defendant Goldberg's scheme of frustrating recovery for the prevailing party whenever an adverse judgment is entered against him. The probative value of this evidence in determining whether plaintiffs would be prejudiced if the Court vacates the default outweighs its potential prejudicial effect.

■ Second, the Court finds Defendant Goldberg's statements do not amount to hearsay. F.R. Evid. 801(d)(2). Statements made by a party opponent are not within the hearsay rule. *Id.* These include not only statements personally made by defendant in an individual capacity, but also in a representative capacity. *Id.* Defendant Goldberg represented to opposing counsel that defendant Artco no longer existed and defendant Holt would declare bankruptcy in case judgment was rendered for plaintiffs. These statements fall outside the hearsay rule. Therefore, the Court overrules defendants' objection on these evidentiary grounds.

■ Although the Court overrules defendants' objections, it modifies the magistrate judge's R & R because it finds plaintiffs have failed to demonstrate they will be prejudiced by vacating the default entry. To establish prejudice, plaintiffs must show that vacating the default will result in the loss of evidence, increased difficulties in discovery, or greater opportunities for fraud and collusion. *INVST Fin. Group*, 815 F.2d at 398. The magistrate judge found further delay in this case may prejudice plaintiffs because defendants may be less likely to pay a judgment.

This Court disagrees. Defendant Goldberg's threats to place defendants in bankruptcy if an adverse judgement is entered against himself or his corporations do not prejudice plaintiffs. If Defendant Goldberg pursues this strategy, he is equally likely to seek financial protection from his creditors if an adverse judgment is entered against him or his affiliates today or one year from now.

Plaintiffs' other arguments similarly fail to persuade the Court. Plaintiffs suggest they would suffer prejudice because of de-

fendants' ever-changing legal theories and factual assertions. (Pls.' Resp. to Objections at 8.) Plaintiffs specifically complain about defenses asserted in other adjudicative proceedings and comments made by Defendant Goldberg that suggest he intends to frustrate plaintiffs' efforts.

The Sixth Circuit has acknowledged in an unpublished opinion that ever-changing legal theories and factual assertions may provide sufficient prejudice by allowing additional time for fraud collusion between the attorney and client. *Toledo Hotel Investors Ltd. P'ship v. Am. Contract Designers, Inc.*, 936 F.2d 573, 1991 WL 119273, at *5–6 (6th Cir. July 1, 1991). Yet, this case is distinguishable from *Toledo Hotel Investors*. This is not an instance where defendant and his attorneys have taxed plaintiffs' counsel with ever-changing legal theories and factual assertions. In fact, the Clerk entered a default entry against defendants specifically because they refused to present *any* legal theories or factual assertions. Defendants also only recently retained counsel to litigate the instant case. Plaintiffs complain about claims and defenses that have never been asserted in this litigation. The Court finds plaintiffs will not be prejudiced by actually having to litigate this case if the Court vacates the entry of default.

Plaintiffs also argue they will suffer prejudice if the default entry is vacated as they have spent "tens of thousands of dollars" seeking a default judgment. (Pls.' Resp. to Objections at 9–10.) The Court finds this argument equally unpersuasive. "The financial costs inherent in setting aside a default and the concomitant delay in realizing satisfaction will rarely establish the requisite degree of prejudice." *Feliciano v. Reliant Tooling Co. Ltd.*, 691 F.2d 653, 656–57 (3d Cir.1982). Further, the Constitution does not require district courts to provide insurance policies for litigation strategies that may or may not prove persuasive. Plaintiffs must decide with their counsel whether a certain legal strategy is worth pursuing from both a legal and financial perspective. When a strategy does not provide the desired result, a court may not prevent the defendants from litigating their claims solely because plaintiffs already have expended a significant sum of money. Therefore, the Court finds plaintiffs have failed to show under the applicable Sixth Circuit standards that they will suffer prejudice if the Court vacates the default entry.

### 2. Meritorious Defenses

The magistrate judge found defendants had no meritorious defenses for the various alleged violations. (R & R at 14–30.) In determining whether a defendant has a meritorious defense, "[l]ikelihood of success is not the measure." *United Coin Meter*, 705 F.2d at 845 (quoting *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 374 (D.C.Cir.1980)). Rather, if any defense relied upon "states a good defense at law," then a meritorious defense has been advanced. *Id.* Thus, "the test is not whether the defendant will win at trial, but rather whether the facts alleged by the defendant would constitute a meritorious defense if true." *In re Park Nursing Ctr., Inc. v. Creditors Comm. of Park Nursing Ctr., Inc.*, 766 F.2d 261, 264 (6th Cir.1985). Such a defense is sufficient if it contains " 'even a hint of a suggestion' which, proven at trial, would constitute a complete defense." *Keegel*, 627 F.2d at 374.

Nonetheless, "[a] mere denial of the claims asserted in the complaint, and nothing more, does not amount to even a 'hint of a suggestion' that the defendant can dispute the allegations in the complaint." *Smith v. Comm'r*, 926 F.2d 1470, 1480 (6th Cir.1991); *see also Sony v. Elm State Elecs.*, 800 F.2d 317, 320–21 (2d Cir.1986) ("[a]lthough in an answer general

denials normally are enough to raise a meritorious defense, the moving party on a motion to reopen a default must support its general denials with some underlying facts"). Therefore, a court must "determine whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." 10 Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure, § 2697 at 531 (1983).

Defendants contend they have asserted a valid defense for each of the alleged offenses. Plaintiffs, however, respond that "Defendants' argument is premised on the faulty belief that merely articulating *any* defense that is generally cognizable under trademark law constitutes a *meritorious* defense that is available to Defendants in this particular case." (Pls.' Resp. to Objections at 5.) The Court questions whether any of defendants' arguments—except those dealing with a fair use defense and the ACPA's safe harbor—amount to anything other than general denials. Under other circumstances, the Court might consider only defendants' purported fair use and safe harbor defenses. The Court, however, will extend defendants the deference they claim they deserve and consider each objection to determine whether they have articulated a factual basis for any meritorious defenses.

### a. Cybersquatting

■■ Defendants object to the magistrate judge's finding that they have no meritorious defenses to plaintiffs' ACPA claim. In the R & R, the magistrate judge found defendants "clearly have no meritorious defenses against plaintiffs' claim of cybersquatting." (R & R at 14.) Adopting the factual findings from the "ICANN" Uniform Domain Name Dispute Resolution Policy arbitration panel, the magistrate judge found Defendant Goldberg registered the domain name victoriassecrets.net with Network Solutions on June 30, 1999. Web users who typed in that domain name were routed to heartsarewild.com website, which offered women's lingerie products for sale.

The magistrate judge determined this registration amounted to a "simple and straightforward violation" of the Lanham Act. (R & R at 15.) Although Defendant Goldberg claimed he registered the domain name in good faith with a right to use it for comparative advertising, the magistrate judge found this assertion "not credible." (*Id.*) Instead of using plaintiffs' mark to compare the quality and price of his products with those offered by Victoria's Secret, the magistrate judge determined Defendant Goldberg routed visitors "directly to a website they did not wish to visit and from which Goldberg could try to sell his goods to a momentarily captive audience." (*Id.*)

Defendants contend the magistrate judge "improperly determined that Defendants intended to profit in bad faith from Plaintiffs' trademark in spite of the evidence clearly demonstrating Defendants had no such intention." (Defs.' Objections to R & R at 7.) In support of their objection, they argue Defendant Goldberg's affidavit stating defendants intended in good faith to compare their products to those offered by plaintiffs places them within the ACPA's safe harbor. They further object to the magistrate judge's conclusion that Defendant Goldberg's sworn affidavit lacks credibility, his assumption that Internet users did not wish to visit defendants' web sites, and that visitors represented a "momentarily captive audience." (*Id.* at 8.)

■■ If applicable, the ACPA's safe harbor would provide defendants with a meritorious defense to plaintiffs' cybersquatting claims. The ACPA provides a safe harbor to defendants who both "believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C.

§ 1125(d)(1)(B)(ii). A defendant who acts even partially in bad faith in registering a domain name, however, is not entitled to benefit from the ACPA's safe harbor provision. *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001). This policy prevents the safe harbor from eviscerating the statute. *Id.*

In arguing their conduct falls within the ACPA's safe harbor, defendants contend they registered and used victoriassecrets.net in good faith to compare defendants' products to those offered by plaintiffs. Internet users, they claim, would have to skip over the top-ranking search engine result for the "Victoria's Secret" search query and select a lower-ranked result. This action, they claim, amounts to comparison shopping and a fair use [6] of plaintiffs' trademark. (Goldberg Aff. ¶¶ 18–19, 21.)

In general, "[a]ll but the most blatant cybersquatters will be able to put forth at least some lawful motives of their behavior." *Virtual Works*, 238 F.3d at 270. The magistrate judge determined that Defendant Goldberg's claims of comparison shopping lacked credibility. The Court similarly finds most of Defendant Goldberg's statements, at best, implausible even when viewed in the light most favorable to defendants. Yet, the Court does not need to consider Defendant Goldberg's credibility for purposes of this motion.

A court rarely will discern intent directly. *Cable News Network, L.P., L.L.L.P. v. CNNEWS.com*, 177 F.Supp.2d 506, 525 (E.D.Va.2001). Typically, a court must infer intent "from pertinent facts and circumstances." *Id.* The ACPA lists nine factors a court should consider when determining whether an individual has acted with a "bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(B). A court is "not limited to considering just the listed factors when making [its] determination of whether the statutory criterion has been met. The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir.2000); *see Northern Light Tech, Inc. v. Northern Lights Club*, 236 F.3d 57, 64–65 (1st Cir.2001).

The first factor requires the Court to determine whether defendants have any legitimate rights in plaintiffs' trademark. 15 U.S.C. § 1125(d)(1)(B)(i)(I). Defendants make no factual showing that they have rights in a trademark identical or similar to plaintiffs' VICTORIA'S SECRET mark. In contrast, plaintiffs' complaint includes copies of several trademark registrations for variations of VICTORIA'S SECRET. (Compl.Ex. 5.) Defendants make no effort to challenge plaintiffs' registration of their trademark. Therefore, the Court finds this factor supports a finding of bad faith.

The second inquiry considers whether victoriassecrets.net constitutes a legal name or commonly used name for defendants. 15 U.S.C. § 1125(d)(1)(B)(i)(II). The defendants in this action include Artco Equipment Company, Inc., Holt Industries, LLC and Howard Goldberg. The record does not include any facts to suggest that any portion of a legal or commonly used name for any of the defendants includes either Victoria or secret.[7]

---

**6.** Defendants also assert a fair use defense based on comparison shopping to plaintiffs' claims of trademark infringement, unfair competition, and state law claims. For the reasons discussed below, the Court finds defendants fail to show a sufficient factual basis to rely on a fair use defense to any of plaintiffs' claims.

**7.** The Court notes defendants in the ICANN arbitration proceedings did offer an explanation for the "coincidence" between the website victoriassecrets.net and plaintiffs. In a

Thus, the Court finds this factor also suggests defendants acted in bad faith.

The third factor assesses whether defendants engaged in a prior, bona fide use of the VICTORIA'S SECRET mark prior to plaintiffs' establishing their rights. 15 U.S.C. § 1125(d)(1)(B)(i)(III). The record shows plaintiffs have used the VICTORIA'S SECRET mark since at least 1982, while defendants registered the domain name victoriassecrets.net with Network Solutions in 1999. (Compl.Ex. 5, 7.) Additionally, defendants do not contend they used the trademark prior to 1982 for a bona fide purpose. Therefore, the Court finds the third factor also suggests defendants acted in bad faith.

■■■ Although the Court remains mindful of its obligation to construe all ambiguous or disputed facts in the light most favorable to defendants, it notes that, when considering this third factor, a presumption of bad faith arises in a situation such as this where "the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame." *E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1675 (E.D.Cal.1989), *aff'd* 967 F.2d 1280 (9th Cir.1992). In these cases, "it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark." *Id.* The parties do not contest the notoriety of plaintiffs' trademark. Further, although the Court finds no direct evidence that defendants knew of the VICTORIA'S SECRET mark when they regis-

tered victoriassecrets.net, it would find an assertion to the contrary too incredible to believe. The Court's finding that defendants' legal or frequently used names have nothing in common with either the name "Victoria" or the word "secret"—other than in the context of plaintiffs' products—bolsters this conclusion. For this additional reason, the third factor supports a conclusion of bad faith.

The fourth factor requires the Court to determine whether defendants engaged in any bona fide noncommercial or "fair use" of the VICTORIA'S SECRET mark. 15 U.S.C. § 1125(d)(1)(B)(i)(IV). Defendants provide no factual basis to allow the Court to conclude that defendants used plaintiffs' trademark for a non-commercial purpose. As discussed below, the Court also finds defendants have not supplied any facts to support a fair use defense. Therefore, the fourth factor supports a finding of bad faith.

The fifth factor analyzes whether defendants intended to divert customers from plaintiffs' online location to a site accessible under the domain name that might harm the goodwill represented by plaintiffs' mark, either for commercial gain or with the intent to tarnish or disparage the mark by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. 15 U.S.C. § 1125(d)(1)(B)(i)(V). Defendants contend they had no subjective intention to confuse consumers. (Goldberg Aff. ¶¶ 16,19.)

The Court disagrees. Even when viewing any ambiguous facts in a light most

---

paper filed with the National Arbitration Forum under penalty of perjury, defendants stated they registered the domain name victoriassecrets.net for use in connection with defendants' bagel equipment site. According to defendants, they have a colleague named Victoria who had secrets about the bagel industry. Thus, they registered the disputed website with the intent of using it for bagel

equipment sales, but later changed its content to lingerie. (*See* Defendants' Response, Uniform Domain Name Dispute Resolution Policy, Pls.' Reply to Defs.' Opposition to Default Judgment (doc. 25) Ex. D.) For reasons that are not entirely clear, defendants submit scanty briefs on this topic and do not advance their "secret bagel" defense.

favorable to defendants, defendants' substantial use of plaintiffs' trademark for its domain name prevented Internet users from knowing defendants' website had no affiliation with plaintiffs until individuals accessed defendants' website and were confronted with defendants' lingerie and sex toy products.

Almost identical conduct has supported a finding of bad faith. *People for the Ethical Treatment of Animals v. Doughney*, 113 F.Supp.2d 915, 920, *aff'd* 263 F.3d 359 (4th Cir.2001). In *Doughney*, the trademark holder for the name PETA sued an individual who had registered the domain name peta.org for his organization called "People Eating Tasty Animals." *Id.* at 917–18. The district court held the registration of a domain name identical to a trademark shows a defendant "clearly intended to confuse, mislead, and divert internet users into accessing his website." *Id.* at 920.

In this case, defendants added an "s" to plaintiffs' trademark. The singular and plural forms of the same word are essentially indistinguishable in the trademark context. *See Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47–48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Therefore, the Court finds the fifth factor supports a finding of bad faith.

The next three factors offer little probative value to the analysis. The sixth factor addresses whether defendants offered to transfer or sell the domain name for financial gain without having an intent to use the domain name in the bona fide offering of any goods or services. 15 U.S.C. § 1125(d)(1)(B)(i)(VI). This factor addresses "the conduct of the prototypical cybersquatter who registers a domain name with no intent to use it and offers to sell it to the legitimate trademark owner." House Judiciary Committee Report on H.R. 3028, H.R.Rep. No. 106–412 at 12 (Oct. 25, 1999).

The seventh factor considers whether defendants provided material and misleading false contact information when applying for the registration of the domain name. 15 U.S.C. § 1125(d)(1)(B)(i)(VII). The eighth factor looks to whether defendants registered or acquired multiple domain names that they knew were identical or confusingly similar to other trademarks. 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

The record does not indicate the existence of any of these factors. While these factors do not support a finding of bad faith, the Court notes they do not suggest defendants acted in good faith. These factors represent a small spectrum of wrongful conduct for the Court to consider in making a determination of whether defendants acted in bad faith. Their absence does not negate bad faith.

Finally, the ninth factor addresses whether the trademark incorporated in defendants' domain name is distinctive or famous. 15 U.S.C. § 1125(d)(1)(B)(i)(IX). As discussed below when considering plaintiffs' dilution claim, the Court finds plaintiffs' mark distinctive and deserving of the highest degree of trademark protection. Therefore, the final factor supports a finding of bad faith.

In summary, six of the nine statutory factors support plaintiffs' claim that defendants registered and used victoriassecrets.net in bad faith. The nature of the remaining three, although not indicative of bad faith, do not weigh against a finding of bad faith. Although a strict numerical majority of factors does not necessitate a finding of bad faith, the Court finds the record more than sufficient to support a finding that defendants acted in bad faith and intended to profit from their use of plaintiffs' marks.

For this reason, defendants cannot seek refuge in the ACPA's safe harbor, as a defendant who acts "even partially in bad faith . . . is not, as a matter of law, entitled to the benefit" of the safe harbor. *Virtual Works*, 238 F.3d at 270. Therefore, the Court overrules defendants' objections to the R & R concerning plaintiffs' ACPA claims.

#### b. Trademark Infringement, Unfair Competition, and Ohio Law Claims

Second, defendants object to the magistrate judge's findings that defendants infringed plaintiffs' trademark by using the VICTORIA'S SECRET mark in the domain name, hyperlinks, metatags, and text of defendants' websites. They contend nominative fair use in comparative advertising and no likelihood of confusion provide valid defenses to plaintiffs' trademark infringement, unfair competition, and Ohio law claims.[8] Finally, they challenge the magistrate judge's application of initial interest confusion in this case.

#### i. Fair Use Defense

Defendants object to the magistrate judge's finding that "defendants' use of the Victoria's Secret mark clearly exceeds the bounds of fair use." (R & R at 21.) The magistrate judge found defendants did not use the mark to describe or compare the quality and price of defendants' and plaintiffs' goods. *Id.* Therefore, he concluded no fair use defense exists.

Defendants contend the magistrate judge's findings regarding a fair use defense require factual determinations the Court cannot make without additional evidence. The Court disagrees.

■■■ The "fair use" defense permits the use of a name or term, other than as a trademark, that is descriptive and is used fairly and in good faith only to describe the goods. 15 U.S.C. § 1115(b)(4). In other words, "fair use permits others to use a protected mark to describe aspects of their own goods." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir.1995). In evaluating defendants' fair use defense, a court must consider whether defendant has used the mark (1) in its descriptive sense and (2) in good faith. *Id.*[9]

■■■ Fair use is unavailable where defendant uses the term in a trademark sense. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 937 (10th Cir. 1983). A term or symbol is used as a trademark when the producer uses it to identify the source of his goods to the public and to distinguish those goods from others. *See M.B.H. Enters. v. WOKY, Inc.*, 633 F.2d 50, 53–54 (7th Cir.1980). In contrast, a descriptive term identifies "a characteristic or quality of an article or service, . . . as, for example, its color, odor, function, dimensions, or ingredients." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1187 (5th Cir.1980). Descriptive

---

8. The Court notes the same analysis applies to trademark infringement, unfair competition, Ohio common law, and Ohio's deceptive trade practices statutes. *Cesare v. Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586, 590 (1987) ("where claims are made under Ohio common law and the deceptive trade practices statutes, courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes"); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1122–23 (6th Cir.1996) (the same factors ap-

ply to claims of trademark infringement, unfair competition, and false designation of origin).

9. As discussed above, the Court finds defendants did not use plaintiffs' VICTORIA'S SECRET mark in good faith. This finding alone precludes a fair use defense. The Court, however, will consider the other factor to determine whether defendants could articulate a fair use defense in the absence of the Court's finding.

terms receive trademark protection only if they have acquired a secondary meaning to the consuming public. *Id.* at 1183. A mark has a secondary meaning if it connotes "a mental association in buyers' minds between the alleged mark and a single source of the product." *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 425 (5th Cir.1984). Examples of descriptive terms with sufficient secondary meanings include "Vision Center," when used in reference to a place where one purchases eyeglasses, and "Everready," when used in reference to batteries or light bulbs. *See Soweco Inc.,* 617 F.2d at 1183–84.

■ The Court finds defendants did not use plaintiffs' trademark in a descriptive sense and, therefore, cannot claim a fair use defense. As the magistrate judge explained, defendants did not compare the quality or price of plaintiffs' lingerie with their own. Instead, the Court finds they incorporated the VICTORIA'S SECRET trademark in the domain name, hyperlinks, metatags, and text of their website in a trademark sense. In essence, defendants' use of the VICTORIA'S SECRET mark attempted to "bait and switch" Internet users who were looking for plaintiffs' products. (*See, e.g.,* Compl. Ex. 7, 10.) The Lanham Act expressly prohibits this type of behavior. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996). For this independent reason, the Court finds defendants could not assert a fair use defense because they use the VICTORIA'S SECRET mark in a trademark rather than a descriptive

sense.[10] Fair use does not provide defendants with a meritorious defense good at law. Therefore, the Court overrules defendants' objection.

### *ii. Likelihood of Confusion*

■ In reaching his conclusions, defendants also contend the magistrate judge improperly relied on the "presumption of likelihood of confusion" developed by the Second Circuit in *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254 (2d Cir.1987). The Court initially finds the magistrate judge's reliance on the presumption appropriate as the record indicates he viewed all disputed and ambiguous facts in a light most favorable to defendants. Nevertheless, the Court will evaluate defendants' objection to determine whether the magistrate judge even needed to rely on the *Mobil Oil* presumption in finding a likelihood of confusion.

■ Often the most important element in trademark analysis, likelihood of confusion considers whether the public believes that "the mark's owner sponsored or otherwise approved the use of the trademark." *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir. 1983) (emphasis in original). Sixth Circuit precedent requires a court to consider eight factors when evaluating likelihood of confusion: (1) the strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care;

---

10. Further, defendants' fair use argument fails for an independent and separate reason. The fair use doctrine provides no protection where the use of another's mark creates a likelihood of confusion among consumers as to source, affiliation, or sponsorship. *See Pebble Beach Co. v. Tour 18 I. Ltd.,* 942 F.Supp. 1513, 1553 (S.D.Tex.1996); *cf., Hypertherm v. Precision Prods., Inc.,* 832 F.2d 697, 700 (1st Cir.1987); *Smith v. Chanel,* 402 F.2d 562, 569 (9th Cir.1968); *G.D. Searle & Co. v. Hudson Pharm. Corp.,* 715 F.2d 837, 841 (3d Cir.1983); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 134 (S.D.N.Y.1989). For reasons set forth below, the Court finds defendants' activities created a strong likelihood of confusion among consumers as to whether they were accessing sites offering plaintiffs' or defendants' products.

(7) defendant's intent in selecting the mark; and, (8) likelihood of expansion of product lines. *Frisch's Rest. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985).

First, the parties do not appear to dispute the strength of the VICTORIA'S SECRET mark. The strength of mark is a factual determination based on the mark's distinctiveness. The more distinct a mark, the more likely confusion will result from its infringement. *Frisch's Rest.*, 759 F.2d at 1264. As the Sixth Circuit noted in *Frisch's:*

> A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.

*Id.* (quoting Callman, *Unfair Competition, Trademarks & Monopolies,* ¶ 20.43 (4th ed.1983)).

Under similar circumstances, the Sixth Circuit has held that the VICTORIA'S SECRET mark is distinctive. *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 470 (6th Cir.2001). In that case, the Sixth Circuit found nothing "about the combination of the possessive 'Victoria's' and 'secret' ... automatically conjures thoughts of women's underwear—except, of course, in the context of plaintiffs' line of products." *Id.* Thus, the appellate court determined the "Victoria's Secret" mark ranks with those that are "arbitrary and fanciful" and "is therefore deserving of a high level of trademark protection." *Id.* The Court fails to see why this reasoning would not apply in this case. Therefore, it finds the VICTORIA'S SECRET mark distinctive and strong.[11]

Second, the Court finds a close relation between plaintiffs' and defendants' prod-ucts. This factor considers whether buyers are likely to believe the goods, similarly marked, come from the same source or are somehow connected with or sponsored by a common company. *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir.1991). After reviewing plaintiffs' verified complaint and their exhibits depicting defendants' websites, the Court finds the two parties provide one line of nearly identical products. Plaintiffs' companies sell women's lingerie, clothing, beauty products, and accessories. (Compl.¶ 34, Ex. 6.) Defendants also sell women's lingerie and other accessories. (Comp.Ex. 10, 13.) Defendants' selection of adult sex toys and other adult-oriented merchandise does not diminish similarities between their core products or decrease the fact that consumers visiting victoriassecrets.net may believe defendants offer plaintiffs' lingerie products.

The third factor requires the Court to examine the similarity of the marks to "determine whether the mark will be confusing to the public when singly presented." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991). "A proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988).

Defendants use the following variations of plaintiffs' VICTORIA'S SECRET mark: victorias secrets, victoria's secrets gifts, victorias secrets catalog, victorias secret, victoria's secret fashion show, victorias secret lingerie, and victoria secret. (Compl. Ex. 7, 9, 10, 11, and 12.) The singular and plural forms of the same word are essentially indistinguishable in the trademark

---

**11.** The Court provides additional analysis concerning the distinctiveness of the VICTO-RIA'S SECRET mark below when considering plaintiffs' dilution claims.

context. *See Mushroom Makers*, 580 F.2d at 47–48. Therefore, the Court finds the marks used by the parties identical.

■ Further, although similarity alone does not compel a determination that marks are likely to be confused, it is a factor entitled to considerable weight. *Champions Golf Club, Inc.*, 78 F.3d at 1119. Therefore, this factor by itself supports a finding that defendants' actions created a likelihood of confusion.

■ The fourth factor considers actual confusion. Courts consistently have held that "evidence of actual confusion is undoubtedly the best evidence of likelihood of future confusion." *Am. Way Serv. Corp.*, 943 F.2d at 601. Nonetheless, "actual confusion is only one of several factors." *Id.* Moreover, because such evidence is "difficult to produce and frequently discounted as unclear and or insubstantial," this factor should be "weighed heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.*

As the magistrate judge noted, plaintiffs have not submitted evidence of actual confusion. Therefore, the Court finds this element favors defendants, although it does not dispose of plaintiffs' claims.

Next, the Sixth Circuit instructs the Court to consider the parties' marketing channels. This considers "how and to whom the respective goods or services of the parties are sold." *Homeowners*, 931 F.2d at 1110. Although the magistrate judge admits he did not know all of the marketing channels used by each party, the Court finds the record sufficient to conclude both parties use the Internet extensively to market their goods. (*See* Compl. Ex. 2, 3, 6, 10, 13.) As plaintiffs' claims concern defendants' on-line marketing practices, the Court finds a sufficient similarity between marketing channels to find likelihood of confusion.

The sixth factor evaluates likely degree of purchaser care. In this case, the Court will use the standard of a "typical buyer exercising ordinary caution." *Homeowners*, 931 F.2d at 1111. The question thus becomes whether a typical buyer exercising ordinary caution would be confused about the affiliation between the two products. *Champions Golf Club*, 78 F.3d at 1121. While consumers typically exercise less care when purchasing lower priced items, the Court finds the record insufficient to make a finding on this factor.

■ The next factor requires the Court to determine defendants' intent in selecting the mark. "Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion." *Am. Way Serv. Corp.*, 943 F.2d at 602. A defendant's good intentions, however, "do not in any way preclude a finding of likely confusion.... [A]bsent ... a showing of [intentional infringement], intentions are irrelevant." *Thomas*, 839 F.2d at 1189. An intent to infringe can be shown through circumstantial evidence. *Am. Way Serv. Corp.*, 943 F.2d at 603. Further, "use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement." *Id.*

Even considering all disputed evidentiary issues in a light most favorable to defendants, the Court finds the only reasonable inference is that defendants intended to infringe upon plaintiffs' VICTORIA'S SECRET mark. As discussed above, the Court finds nothing in the record to suggest defendants used the VICTORIA'S SECRET mark in their domain name, website text, hyperlinks, and metatags for any reason other than to intentionally capitalize on plaintiffs' goodwill. For example, defendants' "victorias secrets," "victoria's

secrets gifts," and "victorias secret lingerie" hyperlinks, which—upon a double-click—transport Internet users to defendants' lingerie and adult sex toy websites, leave little doubt as to defendants' intentions. The Court finds it incredible that defendants argue to the contrary when their own website reads, "Look no further. FREE SHIPPING! NO SALES TAX! You'll find it at *victorias secrets!*" Yet, the hyperlink to "victorias secrets" did not lead to plaintiffs' website.

This conduct confirms the magistrate judge's conclusion that defendants used plaintiffs' mark to offer their own goods and services over the Internet. *See OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 186 (W.D.N.Y.2000) (finding defendant's website, which contained plaintiff's trademark in its domain name, infringed plaintiff's rights by containing a hyperlink connecting users to defendant's commercial website); *Shepard's Co. v. Thomson,* No. C–3–99–318, 1999 WL 777944, at *6 (S.D.Ohio July 15, 1999) ("the Defendant is using the SHEPARD'S trademark to capture the consumers' attention and then directing them to its Key-Cite service").

As additional circumstantial evidence to support the magistrate judge's findings of intentional infringement, the Court refers to its finding above that defendants' legal or commonly used names have no similarity to either "Victoria" or "secret." The Court also cannot fathom any relation between the mark and defendants' products that does not relate to plaintiffs' good will.

The Court finds the circumstantial evidence shows defendants had knowledge of the VICTORIA'S SECRET mark when they used it in their domain name, the text of webpages, hyperlinks to their own sites, and metatags to attract Internet search engines. No rational trier of fact could draw an inference to the contrary. There-

fore, this finding supports an inference of intentional infringement of plaintiffs' mark.

■ Finally, the Court must consider the likelihood of expansion of product lines. As a trademark owner receives greater protection against products and services that directly compete or are in the same channels of trade, a "strong possibility" that either party will expand into competing businesses targeting the same consumers suggests the present use infringes the trademark. *Homeowners,* 931 F.2d at 1112. The parties already directly compete in selling lingerie over the Internet. Therefore, the Court finds the issue of expansion into competing product lines irrelevant to this analysis.

In summary, these factors provide the Court with an "analytical route to the ultimate determination" of whether confusion likely will result from plaintiffs' and defendants' simultaneous use of the VICTORIA'S SECRET mark. *Id.* "The eight factors are not an end in themselves, and all are not of equal significance." *Id.* After considering the factors, however, the Court finds the evidence shows confusion among consumers likely will result from the parties' simultaneous use of the VICTORIA'S SECRET mark.

This result does not change whether the Court invokes or ignores the *Mobil Oil* presumption. The Court finds the magistrate judge correctly applied the *Frisch's* test and, therefore, overrules defendants' objection concerning likelihood of confusion.

### *iii. Initial Interest Confusion*

Defendants also object to the magistrate judge's application of the initial interest confusion doctrine. As background, defendants argued to the magistrate judge that a consumer who reached the purchase screen would no longer think defendants' websites offered plaintiffs' products. The

magistrate judge concluded initial interest confusion prevented defendants from asserting a defense based on an absence of actual confusion at the time of purchase. (R & R at 22.) The magistrate judge found "[t]he use of a mark which misdirects consumers to a competitor's goods constitutes infringement, even if consumers later dispel confusion on their own power or with the assistance of a disclaimer." (*Id.* at 23.) Therefore, he concluded defendants' use of the VICTORIA'S SECRET mark as false hyperlinks "represents a classic case of initial interest confusion." *Id.*

Defendants object to the magistrate judge's finding because "fair use constitutes a defense, good at law, to initial interest confusion." (Defs.' Objections to R & R at 13.) As discussed above, the Court already has determined a fair use defense does not apply, as a matter of law, where, as in this case, a defendant uses a competitor's mark in a trademark sense. Therefore, the Court overrules defendants' objection concerning the magistrate judge's application of initial interest confusion.

### c. Trademark Dilution

■ Defendants also object to the magistrate judge's conclusion that defendants lack a meritorious defense to plaintiffs' trademark dilution claims. In the R & R, the magistrate judge found defendants' use of plaintiffs' VICTORIA'S SECRET mark amounted to dilution by tarnishment, as defendants associated plaintiffs' mark "with sex toys and other adult-oriented merchandise." (R & R at 25.)

■ Defendants object to the magistrate judge's analysis under *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208 (2d Cir. 1999). Under *Nabisco,* a plaintiff must prove "that the senior mark is 'famous' and 'distinctive,' that the junior mark is in

commercial use, beginning after the senior mark has become famous, and that the junior mark 'cause[s] dilution of the distinctive quality of the senior mark.'" *V Secret Catalogue,* 259 F.3d at 476, citing *Nabisco,* 191 F.3d at 215. The Sixth Circuit has adopted *Nabisco*'s ten-factor analysis in determining whether trademark dilution has occurred. *V Secret Catalogue,* 259 F.3d at 476. This requires a court to consider (1) distinctiveness; (2) similarity of the marks; (3) proximity of the products and the likelihood of bridging the gap; (4) the interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products; (5) shared customers and geographic limitations; (6) sophistication of consumers; (7) actual confusion; (8) adjectival or referential quality of junior use; (9) harm to the junior user and delay by the senior user; and, (10) the effect of the senior's laxity in protecting the mark. *Id.,* citing *Nabisco,* 191 F.3d at 217–22.

In their objections, defendants argue several of the *Nabisco* factors weigh in their favor. These include defendants' referential use of the mark for comparative purposes, a lack of actual confusion, and no proximate interrelationship between the products sold by defendants and plaintiffs' VICTORIA'S SECRET mark. Defendants also object to the magistrate judge's reliance on *V Secret Catalogue* in making his recommendation as to the appropriate disposition of plaintiffs' dilution claims.

As discussed above, the Court finds the record devoid of any facts to support defendants' claim that they used the VICTORIA'S SECRET in a referential or descriptive sense. To the contrary, the Court finds the evidence demonstrates conclusively that defendants used the mark in a trademark sense. Further, defendants' argument that no actual confusion exists, even if true, does not provide a

meritorious defense for their actions. *Nabisco*, 191 F.3d at 221 (recognizing that neither actual confusion nor likelihood of confusion is necessary to sustain an action for dilution). At most, the lack of actual confusion provides little probative value in the analysis. *Id.*

Defendants also challenge the interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products. The Court must consider these three factors in evaluating defendants' final objection. *Nabisco*, 191 F.3d at 220.

First, plaintiffs must possess a distinctive trademark. The degree of distinctiveness of a mark governs the breadth of protection it can command. *Nabisco*, 191 F.3d at 215. Generic words, such as "car," have no distinctiveness and cannot receive protection because "to give them protection would deprive competitors of the right to refer to their products by name." *Id.* at 215. Descriptive marks used to describe products or their attributes receive protection only where they have acquired a "secondary meaning." Thus, they receive protection only when "the consuming public has come to associate the mark with the products or services of its user." *Id.* The next highest level of protection includes "suggestive marks." These marks do not name or describe the product for which they are used, but they suggest qualities or claims of the product. They receive trademark rights without the need to demonstrate that consumers have come to associate them with the user of the mark. Yet, because they attempt to suggest qualities of the product, they possess a low level of distinctiveness. *Id.*

Trademark law provides the most protection for marks deemed "arbitrary" and "fanciful." A mark receives arbitrary or fanciful status where there is no logical relationship whatsoever between the mark and the product on which it is used. A substantial range of distinctiveness exists even within this category:

Some marks may qualify as arbitrary because they have no logical relationship to the product, but nonetheless have a low level of distinctiveness because they are common. The most distinctive are marks that are entirely the product of the imagination and evoke no associations with human experience that relate intrinsically to the product. The arbitrary or fanciful quality is what renders the mark distinctive; another seller of the same product or service would have no justification for using the same or a similar mark. The strongest protection of trademark law is reserved for these most highly distinctive marks.

*Id.* at 216.

If a mark lacks distinctiveness, it lacks the very attribute the antidilution statute seeks to protect. *Nabisco*, 191 F.3d at 216. A lack of distinctiveness would provide defendants with a meritorious defense to plaintiffs' claims.

The Court, however, finds plaintiffs' VICTORIA'S SECRET mark distinctive. Although defendants object to the magistrate judge's references to *V Secret Catalogue*, the Court sees no reason why the Sixth Circuit's reasoning concerning the distinctiveness of plaintiffs' mark should not apply to this case. In *V Secret Catalogue*, the Sixth Circuit found:

[A]lthough the word 'secret' may provoke some intrinsic association with prurient interests, it is not automatically linked in the ordinary human experience with lingerie. 'Secret' is not particularly descriptive of bras and hosiery. Nor is there anything about the combination of the possessive 'Victoria's' and 'secret' that automatically conjures thoughts of women's underwear—except, of course, in the context of plaintiff's line of products. Hence, we conclude that the "Vic-

toria's Secret" mark ranks with those that are "arbitrary and fanciful" and is therefore deserving of a high level of trademark protection.

259 F.3d at 470. For these same reasons, the Court finds plaintiffs' mark "arbitrary and fanciful" and, therefore, distinctive.

Second, the Court must consider the similarity of the marks. This element requires the marks to be of "sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior." *Nabisco,* 191 F.3d at 218. Defendants used the words victoriassecrets, victorias secret, victoria's secret fashion show, victorias secret lingerie, victoria secret, victorias secrets, victoria's secrets gifts, victorias secrets catalog, and victorias secrets models in its domain name, website text, hyperlinks, and metatags. As these words are virtually identical to the VICTORIA'S SECRET mark, they conclusively support plaintiffs' claim on this element of dilution.

■ Third, the Court must consider the proximity of the products and the likelihood of bridging the gap. The closer the junior user comes to the senior's area of commerce, the more likely dilution will result from the use of the similar mark. *Nabisco,* 191 F.3d at 219. In this case, the Court finds no reason to determine the likelihood that either plaintiffs or defendants may "bridge the gap." As both purvey lingerie over the Internet, there is no gap to bridge.

In summary, defendants' objection requires the Court to consider the interrelationship between these findings concerning the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products. In this case, plaintiffs have a highly distinctive mark, the senior and junior marks are virtually identical, and defendants use the junior mark in exactly the same area of commerce as the senior. Thus, the Court finds plain-

tiffs have made a conclusive showing of the likelihood of dilution on the issue of the interrelationship of these three factors. Therefore, the Court overrules these objections.

The Court next will consider defendants' objection concerning the magistrate judge's application of *V Secret Catalogue* in the R & R. Specifically, defendants argue "the issues resolved in the R & R are contested issues of fact, not legal determinations subject to collateral estoppel or the like, even if those doctrines were applicable in the instant proceeding." (Defs.' Objections to R & R at 15–16.)

■ The Court again questions whether this satisfies the requirements for a valid objection. Yet, it finds the magistrate judge's use of the *V Secret Catalogue* within the bounds of well-reasoned judicial analysis. Courts and lawyers frequently rely on cases legally and factually similar for analogy. The more legally and factually similar a case, the more persuasive its value. In *V Secret Catalogue,* the Sixth Circuit considered many of the issues concerning trademark characteristics of the VICTORIA'S SECRET mark that this Court must now consider. The magistrate judge and this Court find the reasoning employed by the Sixth Circuit persuasive regarding these issues, such as distinctiveness of plaintiffs' mark. As defendants well know, use of a case by analogy does not amount to collateral estoppel on an issue.

Apparently anticipating this finding, defendants challenge the persuasiveness of *V Secret Catalogue* by arguing that it substantially differs from this case. They argue their "use of the mark on intermediate web pages and comparative advertising simply does not rise to the level of selling products from a proprietorship actually incorporating Plaintiffs' mark in its store name." (Defs.' Objections to R & R at 15.)

With apologies to defendants for borrowing their style of argument, the Court is "flabbergasted" that defendants make this argument. The Court sees no difference between using plaintiffs' mark on the sign attached to a bricks and mortar sex toy store and using plaintiffs' mark on cyber-signs—such as domain name, hyperlinks, and metatags—attached to a online sex toy store. Therefore, the Court overrules defendants' objections concerning the magistrate judge's use of *V Secret Catalogue*.

### 3. Culpability

 The third element of the *United Coin Meter* test requires a court to consider defendants' culpability in the general context of determining whether a petitioner is deserving of equitable relief by vacating the default. *United Coin Meter*, 705 F.2d at 845; *Waifersong*, 976 F.2d at 291. To find culpability, defendants' conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of their conduct on those proceedings. *Shepard Claims Serv.*, 796 F.2d at 194; *see also Ellingsworth v. Chrysler*, 665 F.2d 180, 185 (7th Cir.1981) (defining culpable conduct as "willful misconduct, careless or negligence" as distinguished from "honest mistake").

The magistrate judge found "Defendant Goldberg has not been diligent in defending this case." (R & R at 31.) While he conceded it may have been difficult for defendants to find an attorney, "it should not have taken five months." (*Id.*) The magistrate judge found defendants' search for counsel apparently "did not begin in earnest until after the entry of default, and Defendant Goldberg did not actually retain counsel until the day before the August 15, 2001 hearing on the motion for default judgment." (*Id.*) In conclusion, he found "the entry of default did not result from an honest mistake." (*Id.*)

In their objections, defendants offer a general denial as to their culpability and the willfulness of their actions. They further claim their actions did not amount to bad faith or show disrespect of the Court. (Defs.' Objections to R & R at 16.) Specifically, defendants excuse their failure to file an answer to plaintiffs' complaint because "defendants are out-of-State entities who have been forced to defend themselves in complex litigation in a federal court in an unfamiliar forum hundreds of miles away from where they are domiciled" and "plaintiffs' claims are very specialized and it was difficult to find qualified representation." (*Id.* at 16–17.) Further, they assert Defendant Goldberg "incessantly tried" to secure counsel to represent defendants between April and August and contacted attorneys in New Jersey, New York, Pennsylvania, Illinois, Ohio, California, Washington, Maryland, and Texas. (*Id.*, citing Goldberg Aff. ¶¶ 3–5.) Finally, defendants claim informal contacts between plaintiffs and defendants "may constitute an appearance" in this case. *Lutomski v. Panther*, 653 F.2d 270, 271 (6th Cir.1981).

The Court finds defendants' actions show a reckless disregard for the effect of its conduct on these proceedings. Defendant Goldberg personally received service on March 9, 2001. The summons stated:

> YOU ARE HEREBY SUMMONED and required to serve upon plaintiff's attorney ... an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

(Summons (doc 5) (emphasis in original).) As discussed below, Defendant Goldberg accepted service on behalf of defendants Artco and Holt Industries on March 16,

2001. (Summons (doc. 6).) At the latest, the Local Rules of the Southern District of Ohio required defendants to file an answer to plaintiffs' complaint by April 5, 2001. S.D. Ohio Civ. R. 6.1. Plaintiffs voluntarily allowed defendants a one-month grace period before filing for default on May 10, 2001, which the Clerk entered later that day. (*See* Req. for Entry of Default Against Defs. for Failure to Plead or Otherwise Respond (doc. 7) and Entry of Default by Clerk (doc. 8).) Yet, defendants still remained silent.

On June 13, 2001, plaintiffs moved for default judgment. (*See* Mot. for Entry of Final J. by Default (doc. 10).) Nearly two weeks after plaintiffs requested final judgment by default and almost three months after his answer was due, Defendant Goldberg sent a letter to this Court stating that he "wish[ed] to defend and plead." (Goldberg June 26, 2001 Letter (doc. 11).) On July 12, 2001, this Court referred the matter to the magistrate judge and noticed a hearing for August 15, 2001 at 10:00 a.m. (*See* July 12, 2001 Order (doc. 13).) Defendants again shrouded themselves in silence.

Defendants did not retain counsel to defend this suit until August 14, 2001 at 2 p.m., less than 20 hours before the magistrate judge conducted the default hearing. (August 15, 2001 Tr. at 11.) In summary, defendants effectively began their defense in this case more than four months after the local rules required an answer. They now present a generic laundry list of excuses that they hope will dissuade the Court from finding culpability in this case.

Although the Court must resolve any disputed or ambiguous facts in a light most favorable to defendants, their undisputed conduct presents no such ambiguity. Defendant Goldberg's conclusory assertions of good faith in his affidavit fail to overcome the inferences of willfulness that arise from the defaulting party's failure to

answer. *Widmer–Baum v. Chandler–Halford,* 162 F.R.D. 545, 553 (N.D.Iowa 1995), citing *Whelan v. Abell,* 48 F.3d 1247, 1259 (D.C.Cir.1995). Absent some explanation for this monumental incompetence, the record suggests intentional delay.

Defendants present no evidence of specific impediments they faced in finding counsel to defend this case. Courts view with great skepticism a defendant's claim that it was unable to obtain counsel to defend the action. *See Angelo Bros. Co. v. A & H Co.,* Case No. 96–2507, 1996 WL 571720, at *4 (E.D.Pa. Oct.7, 1996). In *Angelo Bros.,* the defendant, a Chinese manufacturing firm, argued "it was unable to obtain an attorney in Pennsylvania which made it impossible for it to contest the action." *Id.* The district court rejected defendant's excuse and found it acted with the required culpability. The judge reasoned "[i]f defendant had in fact used due diligence from the time the complaint was filed, it should not have been difficult to find a competent lawyer in the entire state of Pennsylvania to enter an appearance." *Id.*

The Court finds this analysis persuasive. In this case, defendants ask the Court to believe they acted without culpability and yet failed to retain counsel for more than five months after being served with plaintiffs' complaint. Defendant Goldberg's affidavit provides an array of excuses for this delay. He states he contacted his "regular attorney" in March 2001 after being served with the complaint. (Goldberg Aff. ¶ 3.) His "regular attorney" referred him to an attorney in Hackensack, NJ who might have the expertise to handle the case. (*Id.*) The Hackensack, NJ attorney, after attempting to settle the case, found he also lacked the required expertise. (Goldberg Aff. ¶ 3.)

Defendant Goldberg then states:

Between April and June, I contacted, on behalf of myself, ARTCO, and HOLT, at least 4 more attorneys in New York, at least 2 in Pennsylvania, 1 in Illinois, and 2 in Ohio, 1 in California, 1 in Washington, 1 in Maryland and 1 in Texas. These attorneys either did not answer my initial inquiries or ultimately did not take the case due to the fact that either: 1) they were not qualified to handle trademark infringement litigation or 2) they were not qualified to practice in federal court in Ohio, or 3) they required a retainer which I could not afford.

(Goldberg Aff. ¶ 5.) On June 22, 2001, he contacted the Court asking for additional time to retain counsel. (Goldberg Aff. Ex. A.) At that time, he represented to the Court that he had "interviewed several lawyers and I estimate that within the next two weeks, I will retain appropriate counsel for the above captioned case." He excused his delay "[d]ue to various circumstances" and assured the Court he was "diligently seeking representation." (*Id.*)

After his letter to the Court, Defendant Goldberg then states that he contacted at least 8 more attorneys in Ohio before retaining Carlile Patchen & Murphy. (Goldberg Aff. ¶ 7). His affidavit includes details of his search technique:

I conducted an Internet search of "trademark lawyers Ohio" and "trademark attorneys Ohio." Similarly, these attorneys either did not answer my inquiries or ultimately did not take the case due to the fact that either: 1) they were not qualified to handle this trademark litigation or 2) they were not qualified to practice in, or located too far away from, the Southern District Court of Ohio, or 3) they required a retainer which I could not afford.

(Goldberg Aff. ¶ 7.) He finally contacted his present counsel on August 8, 2001—one week prior to the hearing before the magistrate judge on this motion. On literally the eve of the hearing, defendants retained counsel. (*Id.*)

The Court finds defendants acted without the required due diligence in attempting to retain counsel. Although the names of the firms contacted and their specific reasons for declining the representation are conspicuously absent from Defendant Goldberg's affidavit, the Court will assume the veracity of his statements. Even viewing the affidavit as truthful, the Court finds no indication that Defendant Goldberg sought counsel, other than the two New Jersey lawyers who quickly declined representation, before defendants' answer date in early April. Further, defendants did not require a lawyer to determine the deadline for answering plaintiffs' complaint. Even without access to the federal and local rules of civil procedure, Defendant Goldberg could have determined the answer date by looking at the summons he received on March 9, 2001. The summons specifically states he had 20 days, exclusive of the date of service, to answer plaintiffs' complaint. (Summons (doc. 5).) Instead of contacting the Court for an extension, he simply ignored the deadline.[12]

In almost three months between the answer date and his June 22, 2001 letter, defendant admits he contacted 13 attorneys seeking representation. During that time, the Clerk entered a default against defendants, who still remained silent. Defendants only contacted the Court after plaintiffs moved for default judgment. The motion seeking default judgment, for

12. The Court notes Defendant Goldberg's regular attorney, appearing *pro hac vice* for a limited purpose, or even Defendant Goldberg, appearing *pro se,* could have sought such an extension, which would not have involved the application of trademark law or the unnecessary expenditure of legal fees.

the first time, included a request for specific relief in the amount of $100,000 plus $57,261.06 in attorneys' fees, which plaintiffs had expended in litigating the, at that time, unopposed lawsuit. (Pls. Mot. for Default J. at 7.) Despite his representation to the Court in his June 22, 2001 letter that defendants would be represented within two weeks, nearly two additional months passed before Defendant Goldberg retained counsel.

Defendant Goldberg's decision to retain counsel less than 20 hours before the magistrate judge's hearing again shows a reckless disregard for the effect of his actions on the judicial proceeding. As a result of his tardiness in retaining counsel, the transcript reveals defense counsel thoroughly unprepared to participate in the hearing, which had been scheduled for more than a month. (See July 12, 2002 Order.) In his opening remarks to the magistrate judge, defense counsel cautioned that any representations he made during the hearing were "based upon a single telephone call" and admitted "I have never met this person [Defendant Goldberg] before in my life." (Tr. of August 15, 2001 Hearing at 12.) He also suggested he had no idea whether statements made by plaintiffs' counsel during the hearing "are accurate or inaccurate." *Id.*

Upon review of the transcript, the Court finds defense counsel offered very little during the hearing that advanced the litigation. The Court does not fault defense counsel for this lack of preparation. By retaining counsel hours before the hearing on default judgment, defendants created a situation which prohibited defense counsel from effectively participating and wasted judicial resources.[13]

Under these circumstances, the Court finds a complete lack of diligence in de-

fending the suit. Defendants present no good cause for their default. Rather, their actions show a reckless disregard for the effect of their conduct on the proceedings.

The Court also finds defendants' reliance on *Lutomski* misplaced. In *Lutomski*, the Sixth Circuit considered what constituted an "appearance" so as to trigger the notice requirement under Federal Rule of Civil Procedure 55(b)(2). *Lutomski*, 653 F.2d at 271. The rule states "[i]f the party against whom judgment by default is sought has appeared in the action, he ... shall be served with written notice of the application for judgment at least 3 days before prior to the hearing on such an application." Fed.R.Civ.P. 55(b)(2). The Sixth Circuit found defendants, through informal contacts with plaintiffs, "provided sufficient evidence of their intent to respond to plaintiffs' claims to entitle them to the notice mandated by rule 55(b)(2)." *Lutomski*, 653 F.2d at 271.

This litigation, however, does not consider what constitutes a sufficient appearance to require notice under Rule 55(b)(2). Instead, the parties litigate whether defendants have "failed to plead or otherwise defend as provided by these rules" under Rule 55(a). Fed.R.Civ.P. 55(a). Merely appearing in a case does not satisfy the pleading requirements of the Federal Rules of Civil Procedure. As *Lutomski* has no application to the instant case, the Court finds it has no persuasive value in determining whether defendants acted with the culpability required to deny their motion to vacate default.

Finally, the Court finds Defendant Goldberg's deliberate attempts to evade service for the corporate defendants provide additional evidence of defendants' culpability. *See Toledo Hotel Investors Ltd.*

---

**13.** Since the hearing, defense counsel has had the opportunity to become thoroughly versed in this case. The assistance of counsel, how-

ever, has not changed the persuasiveness of defendants' defense.

*P'ship.,* 1991 WL 119273, at *2–3; *Allstate Ins. Co. v. Hall,* 115 F.R.D. 491, 493 (E.D.Mich.1986). In this case, on March 9, 2001, plaintiffs attempted to serve Defendant Goldberg on behalf of all three defendants. He accepted process for himself, but refused to accept process on behalf of corporate defendants Artco and Holt Industries. (Farrington Aff. ¶ 5.) In fact, defendants do not appear to dispute plaintiffs' assertion that Defendant Goldberg told plaintiffs' process server that one of the corporate defendants had moved, while he had never heard of the other one. (Farrington Aff. ¶ 6.) By his own admission, Defendant Goldberg is president of Artco and a member of Holt Industries, LLC. (Goldberg Aff. ¶¶ 1–2.) More than a week later, Defendant Goldberg accepted process for the two corporate defendants, but only after the process server confronted him with New Jersey Secretary of State filings showing Defendant Goldberg as the registered agent for both corporate defendants. (Farrington Aff. ¶¶ 6–7.) The Court finds this undisputed evidence independently sufficient to demonstrate defendants' culpability.

For these reasons, the Court overrules defendants' objections concerning culpability.

*4. Summary*

▇▇ Federal Rule of Civil Procedure 55(c) allows a court to set aside an entry of default for good cause shown. Fed. R.Civ.P. 55(c). In determining whether a defendant has shown good cause, the Sixth Circuit requires a district court to consider (1) potential prejudice to the plaintiff by vacating the default entry; (2) whether defendant asserts a meritorious defense; and, (3) whether defendant's culpable conduct led to the default. *United Coin Meter,* 705 F.2d at 845. Although the record fails to reflect any potential prejudice to plaintiffs, the Court finds defendants do not have a meritorious defense to any of plaintiffs' claims and defendants' culpable conduct led to the default. Weighing these factors together, the Court finds defendants have failed to show the existence of good cause to set aside the entry of default in this case.

### III. Disposition

For the foregoing reasons, the Court **OVERRULES** defendants' objections and **ADOPTS** the R & R except for the modifications specifically noted above. Therefore, the Court **DENIES** defendants' motion to set aside the entry of default and **GRANTS** plaintiffs' motion for default judgment.

The Court hereby enters a default judgment in plaintiffs' favor against defendants on the issue of liability. The Court **REFERS** this matter to the U.S. Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) to hold a hearing, if necessary, and issue a report and recommendation as to the amount of damages and attorneys' fees, if any, that should be awarded in this case.

Incorporating the Court's findings and conclusions above, the Court also hereby enters additional findings of fact, conclusions of law, and a permanent injunction against defendants as follows:

1. This action arises under 28 U.S.C. §§ 1331 and 1338, 15 U.S.C. § 1121, and 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b).

2. Plaintiffs Victoria's Secret Stores, Inc. and Intimate Beauty Corporation are Delaware corporations having a place of business at Three Limited Parkway, Columbus, Ohio 43230. Plaintiff V Secret Catalogue, Inc. is a Delaware corporation having a place of business at 1105 North Market Street, Wilmington, Delaware 19801. Plaintiff Victoria's Secret Direct, LLC, is a Delaware limited liability company having a place of business at Three

Limited Parkway, Columbus, Ohio 43230 (collectively, "Victoria's Secret").

3. Defendant Artco Equipment Company, Inc., ("Artco") is a New Jersey Corporation with a principal place of business at 40 Tillman Street, Westwood, New Jersey 07675. Defendant Holt Industries, LLC ("Holt") is a New Jersey limited liability company with a principal place of business at 40 Tillman Street, Westwood, New Jersey 07675. Defendant Howard Goldberg ("Defendant Goldberg") is the president of defendant Artco and an officer of defendant Holt (collectively, "Defendants"). Defendants are doing business in the state of Ohio and within the jurisdiction of this Court.

4. Defendants are the owners and operators of several businesses that they advertise and operate via the Internet, including businesses that advertise and sell lingerie and adult sex toys. As an officer of both Artco and Holt, Defendant Goldberg exercises control over Artco and Holt, and he controlled the activities of the defendants being enjoined herein.

5. Victoria's Secret operates a well-known lingerie business. It also sells other products under the mark VICTORIA'S SECRET, including, *inter alia*, clothing, beauty products, outerwear, fragrances, sleepwear, bedding, swimwear and gifts. These items are sold through its more than 800 retail stores, its printed catalogue, and through its Internet web site, *www.victoriassecret.com.*

6. The mark VICTORIA'S SECRET has been adopted and continually used by Victoria's Secret or its predecessors since at least as early as 1977, and has been federally registered with the United States Patent and Trademark Office since 1981, long prior to the acts of the defendants being enjoined herein. During that time, Victoria's Secret has engaged in extensive worldwide advertising and promotion of its famous mark VICTORIA'S SECRET, and

sales in recent years have been in the billions of dollars.

7. As a result of substantial sales and promotion, the VICTORIA'S SECRET mark has become widely and favorably known as identifying products originating from, sponsored by or associated with Victoria's Secret.

8. Plaintiff V Secret Catalogue, Inc. is the owner of the following United States Trademark Registrations containing the mark VICTORIA'S SECRET, which it licenses to the other Plaintiffs:

| | | |
|---|---|---|
| Reg. No. 1,146.199 | Registered | 01/20/1981 |
| Reg. No. 1,179.309 | Registered | 11/24/1981 |
| Reg. No. 1,224,782 | Registered | 01/25/1983 |
| Reg. No. 1.924.706 | Registered | 10/03/1995 |
| Reg. No. 1,908.042 | Registered | 08/01/1995 |
| Reg. No. 1,935.346 | Registered | 11/14/1995 |
| Reg. No. 2,099.903 | Registered | 09/23/1997 |
| Reg. No.2,093,476 | Registered | 09/02/1997 |
| Reg. No. 2,168,500 | Registered | 06/23/1998 |
| Reg. No. 2,168,510 | Registered | 06/23/1998 |
| Reg. No. 2,196.470 | Registered | 10/13/1998 |
| Reg. No. 2,118,112 | Registered | 12/02/1997 |
| Reg. No. 2,165,974 | Registered | 06/16/1998 |
| Reg. No. 2,300.658 | Registered | 12/14/1999 |
| Reg. No. 2,330.205 | Registered | 03/14/2000 |
| Reg. No. 2,416.251 | Registered | 12/26/2000 |
| Reg. No. 2,407.056 | Registered | 11/21/2000 |

9. All of the foregoing registrations (collectively referred to as "the mark VICTORIA'S SECRET") are valid and subsisting. In addition, several of those registrations are "incontestable" under 15 U.S.C. § 1065.

10. Notwithstanding Victoria's Secret's well-known and long-established rights in the mark VICTORIA'S SECRET, and with actual and constructive notice of Victoria's Secret's trademark rights, defendants have used in interstate commerce the mark VICTORIA'S SECRET and confusingly similar variations thereof in an Internet domain name and on Internet websites to redirect Internet web users to defendants' web sites, on which defendants offer for sale lingerie and adult sex toys.

11. In mid–2000, Victoria's Secret instituted against defendants Artco and Goldberg an ICANN domain name dispute

proceeding over defendants' ownership of the domain name *www.victoriassecrets.net*, in which a unanimous panel of arbitrators from the National Arbitration Forum found in favor of Victoria's Secret and awarded ownership of that domain name to Victoria's Secret.

12. By this Opinion and Order, the Court hereby enters a default judgment against defendants and in favor of Victoria's Secret on its claims of trademark infringement, unfair competition, false advertising, dilution, cybersquatting, and deceptive trade practices.

Accordingly, it is **ORDERED** that Artco Equipment Company, Inc., Holt Industries LLC, Howard Goldberg and their officers, agents servants, employees, attorneys, successors and assigns, and all those persons in active concert or participation with them or acting on their behalf who receive notice of this Order, are hereby enjoined from the following acts:

(a) using, attempting to use, or causing to be used the trademark or service mark VICTORIA'S SECRET or any other variation confusingly similar to the mark VICTORIA'S SECRET, including but by no means limited to the names "Victoria's Secret," "Victoria's Secrets," "Victorias Secret," "Victoria Secret," or "Victorias Secrets," in commerce, either through the Internet or any other medium now known or that may be developed in the future;

(b) using, attempting to use, owning, or causing to be used in an Internet domain name, including but not limited to, registering, attempting to register, or causing to be registered, either directly or through others, the trademark, or service mark VICTORIA'S SECRET or any other variations confusingly similar to the mark VICTORIA'S SECRET, or likely to cause dilution of the mark VICTORIA'S SECRET, or likely to cause injury to Victoria's Secret's business reputation in con-

nection with any activity on the Internet or in any other medium;

(c) listing, printing, posting, indexing, linking, storing, or otherwise associating, either directly or through other entities, any of defendants' websites containing the mark VICTORIA'S SECRET or any other variations confusingly similar to the mark VICTORIA'S SECRET, or likely to cause dilution of the mark VICTORIA'S SECRET, or likely to cause injury to Victoria's Secret's business or its business reputation in connection with any activity in any form, including, but not limited to, visible, invisible, encrypted, searchable, or non-searchable forms, within websites, webpages, homepages, Internet sites, Internet pages, database programs, or any other storage means, either temporary or permanent, on the Internet or any other medium;

(d) operating a web site using the trademark VICTORIA'S SECRET or any confusingly similar variation thereof, in text or a domain name intended to, or having the effect of, diverting traffic from Victoria's Secret's web site, including but not limited to any sites found at the URLs *http://s ecure100.local.net/~htoy/victorias-secret.html, http://secure100.local.net/~htoy/victoria.html, www.bodyshack.com, www.houseoflovetoys.com, or www.heartsarewild.com.*

(e) using the trademark VICTORIA'S SECRET or any other variations thereof in website text, in website metatags, in Internet search engine registrations, in Internet banner advertisements or in any other manner now known or later developed on the Internet or any other medium;

(f) otherwise engaging in acts, either directly or through other entities, of dilution of Victoria's Secret's marks;

(g) and, with such injunction including a provision directing defendants to file with

the Court and serve upon Victoria's Secret, within thirty (30) days after the entry of such order or judgment, a report in writing and under oath setting forth in detail the manner and forum in which defendants have complied with the injunction.

Further, the Court **DENIES** as moot defendants' motion to strike (doc. 21) and defendants' motion to vacate the Court's order granting the preliminary injunction (doc. 26).

The Clerk shall remove documents 10, 21, 23, and 26 from the Court's list of pending motions.

**IT IS SO ORDERED.**